This case was originally argued before the Full Commission upon defendant's appeal on January 14, 1994. On March 23, 1994 the Full Commission filed an Order requiring the plaintiff to undergo an independent medical examination by a specialist in the field of pulmonology. This examination was to determine: (1) if plaintiff's injury of April 12, 1988 caused any exacerbation of an alleged asthma problem; (2) if any disability continued after January 16, 1989 following the November 3, 1988 surgery by Dr. Hayes on plaintiff's wrist; and (3) whether the expert wished to include any other diagnosis, conclusions and proposed treatment. Thereafter, the defendant arranged for the plaintiff to be examined by Dr. L. W. Stringer of Forsyth Respiratory Associates, P.A. Dr. Stringer's report was submitted to the Full Commission by letter of May 16, 1994, and answered the foregoing enumerated issues as follows:
 In my opinion there is a possibility that acute exacerbation of this gentleman's asthma could have occurred secondary to the anesthetic or being immobilized in bed for a couple of days. This certainly would be a short type of exacerbation and I would have expected it to have been over with by the time he was discharged, or certainly within a couple of weeks.
 I do not believe that any pulmonary disability secondary to the surgery of November 3, 1988 could have existed after January 16, 1989.
 Other diagnosis, conclusions or proposed treatments: He has developed this year a G.I. ulcer vs. acute gastritis, probably secondary to alcohol use which is what he has told me in my history. As far as additional treatments, I have no suggestions.
(Emphasis added).
This case came up for review again before the Full Commission on December 16, 1994. Based upon a review of the entire record in this file, and with attention to the report submitted by Dr. Stringer, the Full Commission has concluded that defendant has shown good grounds for an amendment of the award, relative to plaintiff's alleged continuing disability.
The September 16, 1992 Opinion and Award is accordingly HEREBY REVERSED.
* * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties as a
STIPULATION
Defendant has paid temporary total disability compensation to plaintiff in the amount of $157.21 per week for the period of time from July 14, 1988 through February 4, 1990.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission makes the following
FINDINGS OF FACT
1. Plaintiff was injured in an admittedly compensable injury by accident on April 12, 1988. The injury occurred when plaintiff slipped and fell backward, striking his left wrist on a trash can. Plaintiff did not report the injury for about two weeks. On April 25, 1988 plaintiff reported the accident and was taken to the emergency room at Forsyth Memorial Hospital. For the next two and a half months plaintiff sought no medical treatment and worked at his regular job duties without complaints.
2. At the time of the injury plaintiff was 45 years old, with a date of birth of May 15, 1943. For his education plaintiff had completed the tenth grade and his work history was one of unskilled labor.
3. Plaintiff originally began working for defendant at its Sanitation Department in approximately mid-July 1973. Plaintiff worked for two months, and then stopped working because he claimed his asthma made it difficult to continue his job. Plaintiff applied for social security benefits in November 1973, and reported that he had pain in his side, his head, his back, and his throat, but his primary medical problem was asthma. Plaintiff received social security benefits between January 1974 and June 1976, and was over-paid $2,992.46 during this period. Plaintiff began working for a packing company as a truck driver in 1975 and continued at this job until October 1977.
4. Plaintiff again applied for social security benefits in 1978. Plaintiff reported asthma, kidney trouble, gallstones, pain in the neck and right shoulder, and a "skipping heart." Plaintiff's claim was denied; and he applied again for benefits in 1979, reporting the same physical problems. At the time of the 1979 application plaintiff had been out of work for about one and a half years. Plaintiff's application was again denied, and he filed a request for reconsideration. In the request for reconsideration, plaintiff stated that his physical condition had worsened. Plaintiff described the worsened condition as follows:
"I can't do anything. I have gotten so if I walk outside, I have to come back in. I develop a pain in my spine. My hands have started drawing."
Plaintiff's claim was again denied and he returned to work.
5. Between 1980 and 1982, plaintiff worked as a cook in a cafeteria. From March 1982 through May 1984, plaintiff worked as a janitor. Plaintiff stopped working in May 1984 and again applied for social security benefits. At this time plaintiff described the physical conditions which kept him from working as follows: shortness of breath, pains in the wrist, and nervousness. Plaintiff described his limitations as follows: could not be in the presence of pollen, dust, or "fumes"; no lifting or carrying more than ten pounds; no standing or walking more than one to two hours at a time; and no sitting for more than one hour. Plaintiff further reported that bending from the waist, reaching overhead, or stretching caused shortness of breath, that stress made him upset, and that he was only able to do some light housework.
6. Plaintiff returned to work in 1986. He obtained a job with defendant working in City Hall as a janitor. Plaintiff's job duties were to dust, wax and buff floors, and to vacuum. In 1988 plaintiff was transferred to the Sanitation Department where his job duties included collecting garbage. Plaintiff claims that the reason he transferred to another position was because of his asthma, as the fumes in the janitorial job aggravated his breathing problems. Plaintiff's accident occurred approximately four months after the transfer. Plaintiff has not been gainfully employed since that time.
7. The factual findings in paragraphs 3, 4, and 5 of this Opinion and Award are based on reports for the Social Security Administration. These reports reflect conflicting information, but the facts, as stated, appear to be the most consistent. The reason for considering the social security reports is that the reports made by plaintiff contradict statements plaintiff made at the hearing and statements plaintiff made to his doctors providing a medical history. For example: (1) Plaintiff testified that he had no problems with his back, his wrists, or his shoulder area before April 1988. In fact, plaintiff had made complaints of impairment in one or more of these areas for 18 years. (2) Plaintiff testified that he could not remember filing any social security claims before 1985. This statement is not credible as plaintiff had made several applications. Plaintiff had been out of work for a substantial amount of time while filing the social security applications, and it is highly unlikely that he had forgotten the applications. (3) In the medical records plaintiff's doctors indicate an assumption that plaintiff's back and wrist problems began shortly after his accident (June 1, 1989 — Dr. Branch describes neck and arm pain as occurring "over the past year"; May 15, 1989 — Dr. Nicastro describes the accident and then refers to neck and arm pain as occurring "since that time"). None of the doctors indicated that plaintiff informed them of a long-term problem with neck, shoulder and wrist pain.
8. Between 1973 and 1979 plaintiff has an extensive history of medical treatment. For the most part, this treatment was for asthma, including between 75 to 100 examinations at hospital emergency rooms. In addition, there was osteoarthritis in the mid-dorsal and lower lumbar area of the back at Dr. M. Arshad Bhatti's examination of June 24, 1975. There was multi-level degenerative disc disease (with disc narrowing and bone spurs) of the central and lower cervical spine at Dr. Schlossberg's examination of December 2, 1978. There was cervical spondylosis and pain/numbness of the left hand at Dr. Eben Alexander's examination of January 1978. There was cervical spondylosis with asteophyte formation at the examination of Dr. Paul Harrington and Dr. Ross McLean in September 1979. In October 1977 plaintiff reported the seriousness of his condition as follows: "If I had closed my eyes yesterday, I'd probably have died."
9. During this time, between 1973 and 1979, on several occasions, plaintiff's physicians found that he was unable to work. On November 1, 1973, Dr. G. Mullins certified that plaintiff's work capacity was "none"; on April 19, 1974, Dr. J. W. Wellborn restricted plaintiff to sedentary activity; on September 20, 1974, Dr. Mullins certified that plaintiff was unable to work and that the inability would continue for an "indefinite" period; on August 11, 1976, Dr. Lynn Hale certified that plaintiff's capacity to work was "none." In December 1978, Dr. Schlossburg reported that plaintiff "frequently cannot hold a job secondary to problems in the environment exacerbating his asthma."
10. There is a gap in plaintiff's medical records from approximately 1980 through 1986. However, during this time plaintiff filed one of his applications for social security disability; and so, apparently, his treatment and problems continued during this period.
11. Following 1986 plaintiff continued with regular treatment for his asthma. In addition to his asthma, there were references to back, arm, and wrist problems during plaintiff's medical treatment. On August 1, 1986 plaintiff reported to his physician that he had a two-month history of pain at the base of his cervical spine radiating to his left shoulder and down the dorsal surface of his forearm and wrist. Plaintiff reported that the pain was continuous and that his wrists were swelling. On September 5, 1986 plaintiff reported to his physician of pain at the base of his cervical spine, his left upper shoulder, his dorsal forearm, and his wrists. Plaintiff reported that the pain on both of these occasions was continuous. At the time there was narrowing of the spinal disc at C3-4 and C6-7, mild encroachment on the neuroforamina at C4-5 and C6-7 on the right, and there was mild left-sided radiculopathy at C5-6. On February 25, 1988, approximately six weeks before his accident, plaintiff reported to his physician that he had neck and low back pain beginning approximately one week earlier. Plaintiff denied any trauma, but at the time there was tenderness to palpitation at his lower cervical spine and sore muscle tenderness.
12. On April 15, 1988, three days after the accident, plaintiff reported to his physicians for a follow-up examination for his asthma. Plaintiff reported to his physician that he "feels much better since the job change (from janitor to trash collector), but feels his asthma has been acting up due to pollen." Plaintiff denied any other problems or physical complaints.
13. On April 25, 1988, plaintiff was examined at the emergency room at Forsyth Memorial Hospital. Plaintiff reported the incident with the trash can and reported that he felt a pulling in his shoulder and arm. At the time, plaintiff had a muscle strain and he was released with no return appointment.
14. Plaintiff continued to work until July 12, 1988 when he was referred to Primecare for treatment. At the time of this examination there were at least two bony nodules adjacent to the lateral margin of the navicular. Plaintiff was referred to Dr. John T. Hayes. On September 6, 1988, Dr. Hayes examined plaintiff and reported the following:
 . . . In May while on the job he (plaintiff) was gathering trash when he slipped, fell backwards and struck his hand and wrist on a trash barrel. . . . He has other symptoms, that is, he has symptoms across the back of the neck and into the left shoulder and arm. . . . In the past, I have seen people in this occupation, that is, who handle heavy trash barrels for the city, with traumatic arthritis to the wrists. This patient apparently has back entity and aggravated it with his fall.
15. Dr. Hayes kept plaintiff out of work through January 16, 1989. The initial treatment by Dr. Hayes was conservative; however, Dr. Hayes performed a left wrist arthrotomy on November 3, 1988. At the time, plaintiff had traumatic arthritis of the left wrist with a large loose body of approximately one centimeter and a smaller loose body, both of which were bones with cartilage overlaying.
16. Plaintiff returned to work at his regular duties with defendant. Plaintiff worked for approximately two weeks, when he reported that he was unable to continue due to pain and stiffness in his wrist. Plaintiff was referred to Dr. Robert Underall on February 3, 1989. The doctor excused plaintiff from work and referred plaintiff to Dr. L. Andrew Koman, an orthopedic surgeon at North Carolina Baptist Hospital.
17. Dr. Koman examined plaintiff on March 15, 1989. At the time of the examination there was moderate swelling of the wrist and some limitation of motion. For the next five weeks plaintiff continued to report problems with his cervical and lumbar spine. Dr. Koman referred plaintiff to Dr. Joseph F. Nicastro for evaluation of his cervical spine problems. Dr. Nicastro saw plaintiff on May 14, 1989 and referred him to Dr. Charles L. Branch, Jr., a neurosurgeon. Dr. Branch first examined plaintiff on June 1, 1989. At the time of the examination by Dr. Branch, there were multiple levels of cervical spondylosis with some significant nerve root compression and there was a possibility of spinal cord compression as well. Dr. Branch recommended an anterior cervical diskectomy at C4-5, and this procedure was performed on August 18, 1989. Following the surgery, Dr. Branch wrote the following:
 I don't believe his (plaintiff's) neck and arm pain can absolutely be related to the injury to his wrist. I believe that he has underlying cervical degenerative disease that probably was exacerbated or worsened by his fall and injury to his wrist. In that sense they are related.
Dr. Branch continued to treat plaintiff through July 18, 1990, at which time Dr. Branch rated plaintiff as having a 15 percent permanent partial impairment to his back. Dr. Branch returned plaintiff to the care of Dr. Koman.
18. During plaintiff's first examination by Dr. Koman after his neck surgery, Dr. Koman suggested that plaintiff have additional surgery to fuse his wrist. Plaintiff initially agreed to this surgery, but later changed his mind. He testified that the previous surgeries by Drs. Hayes and Branch had not relieved his pain, that they had actually made his asthma worse, and that he was afraid to go through another procedure. Dr. Koman then rated plaintiff as having a 35 percent permanent partial impairment to his left wrist. Dr. Koman released plaintiff to return to work, at one-handed work only.
19. During the period following his accident, plaintiff continued his treatment for asthma. Plaintiff testified that after his accident his asthma became worse, and there is support for plaintiff's statements in his medical records. For example, the progress note from Reynolds Health Center dated November 7, 1989 reports "[a]sthma got worse since came out of hospital (3 months ago)." In an office note dated November 8, 1989, Dr. Branch reported that plaintiff "still has significant muscle spasm in his neck and this has exacerbated his asthma, I believe." In a letter dated November 10, 1989 to Dr. Branch from Prybylo-Ess Physical Therapy indicated that plaintiff "does appear to have severe cervical muscle tightness post-operatively with correspondingly decreased ROM [range of motion]." In Action Report #3, dated October 26, 1989, nurse Nancy Groves stated that plaintiff "appears to be in more respiratory distress now than when I first met him, which he claims was aggravated by the cervical diskectomy. He refused to contact Dr. Branch concerning his on-going symptoms even though, by his own account, the symptoms are increasing." And in Action Report #12, dated July 18, 1990, nurse Groves stated that "Dr. Branch told the client he could expect to continue to have pain, but would need to learn to handle it and realize that the pain could make his asthma worse." Based upon the statements entered above, the injury of April 12, 1988 and the resulting treatment caused a significant exacerbation of plaintiff's pre-existing asthma.
20. Because of the injury by accident, and the resultant exacerbation of his pre-existing physical conditions, plaintiff is unable to return to his former job with defendant as a trash collector.
21. Because of the injury by accident and the resultant exacerbation of his pre-existing physical conditions, plaintiff cannot perform the job at the landfill which was offered to him by defendant. Plaintiff testified that he could not perform this job.
22. There is insufficient evidence of record from which the undersigned can infer that there are jobs available within plaintiff's community which he can reasonably be expected to obtain.
23. However, the record does not reflect that plaintiff is "permanently" unable to obtain any gainful employment. Plaintiff's doctors have released plaintiff for employment under restrictions, and they have noted that plaintiff is muscular and physically fit. Considering plaintiff's age, education, work experience, and degree of impairment, there may be jobs available in his community which plaintiff can perform and can be reasonably expected to obtain.
24. The words of Dr. Stringer in his letter of May 10, 1994 to defense counsel appear to be self-explanatory as follows:
 "In conclusion, I find a gentleman that has severe, obstructive pulmonary disease and is disabled, from his pulmonary function studies, enough to meet, I think, the social security requirement for disability. At least this is the case on the pulmonary function that I have today. I am not able to equate this back to his injury or his cervical and hand surgery." (Emphasis added).
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. On April 12, 1988, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer which caused a disabling injury to his left wrist. N.C.G.S. § 97-2(6); Morrison v. Burlington Industries,304 N.C. 1, 282 S.E.2d 458(1981).
2. On April 12, 1988, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer which aggravated a pre-existing condition to plaintiff's back. N.C.G.S. § 97-2(6); Morrison v. BurlingtonIndustries, supra.
3. On April 12, 1988, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer which resulted in an aggravation of a pre-existing condition, which was plaintiff's asthma. N.C.G.S. § 97-2(6); Morrison v. Burlington Industries, supra.
4. Plaintiff was only entitled to temporary total disability payments from April 12, 1988 until January 16, 1989. N.C.G.S. § 97-29. As of the latter date, plaintiff's physician could not attribute any asthmatic condition to plaintiff's injury by accident on April 12, 1988.
5. As a result of the injury by accident to the plaintiff, he is entitled to payment for a 35 percent permanent partial disability to the left wrist, and 15 percent permanent partial disability to his back.
6. Plaintiff is entitled to the payment of all medical expenses incurred, or to be incurred, as a result of his injury by accident, so long as said services effect a cure, give relief, or lessen plaintiff's period of disability. N.C.G.S. § 97-25.
7. Defendant is entitled to a credit for any temporary total disability compensation paid for the period of time after January 16, 1989.
* * * * * * * * * * *
Based upon all of the foregoing, the Full Commission enters the following
AWARD
1. Defendant shall pay temporary total disability compensation at the rate of $167.21 per week from April 12, 1988 until January 19, 1989. That portion of this compensation which has accrued shall be paid in a lump sum, subject to an attorney fee is provided below and subject to a credit for defendant.
2. Defendant shall pay plaintiff for a 35 percent permanent partial disability to his left wrist subject to the credit owed defendant and the attorney's fee.
3. Defendant shall pay plaintiff for a 15 percent permanent partial disability to his back subject to the credit owed defendant and the attorney's fee.
4. Defendant shall pay all medical expenses incurred by plaintiff, after said bills have been submitted through the defendant to the Industrial Commission and approved by the Commission.
5. Defendant is entitled to a credit for any temporary total disability compensation paid for the period of time after January 16, 1989.
6. An attorney's fee in the amount of 25 percent of all compensation awarded herein is approved for plaintiff's counsel. Said compensation having accrued, it shall be deducted from any compensation owed plaintiff and paid directly to his attorney.
7. Defendant shall pay all costs.
This the _____ day of __________________________, 1995.
FOR THE FULL COMMISSION
 S/ _____________ JAMES J. BOOKER COMMISSIONER
CONCURRING: S/ _____________ COY M. VANCE COMMISSIONER
S/ _____________ THOMAS J. BOLCH COMMISSIONER
JJB:mj 1/9/95